392 So.2d 1305 (1981)
FORD MOTOR COMPANY, Appellant,
v.
ATWOOD VACUUM MACHINE COMPANY, Appellee.
No. 56238.
Supreme Court of Florida.
January 8, 1981.
*1306 Monroe E. McDonald of Sanders, McEwan, Mims & McDonald, Orlando, for appellant.
Elmo R. Hoffman and Stephen C. Sawicki of Hoffman, Hendry, Stoner, Sims & Sawicki, Orlando, for appellee.
BOYD, Justice.
This cause is before the Court on appeal from a circuit court order granting Atwood Vacuum Machine Company's motion to dismiss Ford Motor Company's third party complaint for lack of jurisdiction. Because the original plaintiffs reached a settlement with Ford Motor Company after the filing of the third party complaint, the order of dismissal terminated the litigation below and had the effect of a final judgment. In dismissing the Atwood company from the product liability action, the trial court held a portion of the Florida "long arm" jurisdiction *1307 statute unconstitutional as sought to be applied. Ford Motor Company, defendant and third party plaintiff below, appeals. We have jurisdiction under article V, section 3(b)(1), Florida Constitution, as it existed prior to the 1980 amendment. We reverse.
Elizabeth L. Westerling and her husband brought an action for damages against Ford Motor Company and Holiday Ford, Inc., a Volusia County automobile dealer, alleging that she was injured by the faulty operation of the rear door hinge of a new Ford station wagon. It was alleged that while Mrs. Westerling was unloading the station wagon at the rear door, a detention spring in the hinge broke, causing the door to swing shut and strike the plaintiff on her back. The plaintiff alleged that the faulty operation was the result of defective manufacture of the car.
Ford Motor Company filed a third party complaint against Atwood Vacuum Machine Company, a foreign corporation headquartered at Rockford, Illinois. Ford alleged that Atwood had manufactured the door hinge assembly; that the incident alleged by the plaintiffs, if it occurred as alleged, was caused by a defect in the manufacture or material of the door hinge assembly; that Atwood had warranted the product to be free of defects; and that Atwood supplied door hinge assemblies to Ford knowing that they were to be incorporated into automobiles manufactured by Ford and knew that some of these automobiles would be shipped to Florida and sold.
The Atwood company moved to dismiss the complaint on the ground that section 48.193, Florida Statutes (1977), which enumerates the acts subjecting persons to the jurisdiction of Florida courts, does not provide for jurisdiction in a situation such as the one alleged in the third party complaint. The motion to dismiss did not dispute the factual allegations or otherwise attempt to demonstrate the inapplicability of the "long arm" statute.
The trial court did not explicitly rule on Atwood's contention that the statute was not intended to apply to the facts alleged. Implicit in the trial court's order, however, is a holding that the statute is intended to apply, because the court proceeded to rule on the question  not presented by the motion to dismiss  of the statute's constitutionality. The court held section 48.193(1)(f)2., Florida Statutes (1977), "unconstitutional as applied to the facts of this case," citing Harlo Products Corp. v. J.I. Case Co., 360 So.2d 1328 (Fla. 1st DCA 1978). Thus, there are two issues in this case: first, whether the statute was intended to apply; second, whether it may be applied consistently with due process.
Section 48.193(1), Florida Statutes (1977), provides for jurisdiction of Florida courts over persons, including nonresidents, who perform certain enumerated acts:
(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits that person and, if he is a natural person, his personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following:
(a) Operates, conducts, engages in, or carries on a business or business venture in this state or has an office or agency in this state.
(b) Commits a tortious act within this state.
(c) Owns, uses, or possesses any real property within this state.
(d) Contracts to insure any person, property, or risk located within this state at the time of contracting.
(e) With respect to proceedings for alimony, child support, or division of property in connection with an action to dissolve a marriage or with respect to an independent action for support of dependents, maintains a matrimonial domicile in this state at the time of the commencement of this action or, if the defendant resided in this state preceding the commencement of the action, whether cohabiting during that time or not. This paragraph does not change the residency requirement for filing an action for dissolution of marriage.

*1308 (f) Causes injury to persons or property within this state arising out of an act or omission outside of this state by the defendant, provided that at the time of the injury either:
1. The defendant was engaged in solicitation or service activities within this state which resulted in such injury; or
2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use, and the use or consumption resulted in the injury.
(g) Breaches a contract in this state by failing to perform acts required by the contract to be performed in this state.
The third party complaint asserted that jurisdiction could be exercised over Atwood pursuant to paragraph (f), subparagraph 2. In support of this assertion, Ford alleged, as discussed above, that Atwood manufactured spring latch assemblies and sold them to Ford to be incorporated into automobiles and that the plaintiff's injuries were caused by one of these components incorporated into an automobile and shipped to Florida where it was purchased by the plaintiff. These allegations placed Atwood within the reach of the statute on the ground that the defendant's act or omission outside the state caused injury within the state; and that the defendant manufactured products outside the state that were used within the state "in the ordinary course of commerce." Thus, the undisputed allegations were sufficient to invoke the statute. We hold that it was intended to be applied to such a situation. See Electro Engineering Products Co. v. Lewis, 352 So.2d 862 (Fla. 1977).
The second issue we must decide is whether the courts of Florida have jurisdiction to adjudicate Ford Motor Company's claim against the Atwood company. This issue arises because the due process clause of the fourteenth amendment to the United States Constitution imposes limits on the jurisdiction of state courts to adjudicate the rights, interests, and obligations of defendants not resident in the forum state. E.g., Rush v. Savchuk, 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); Kulko v. Superior Court of California, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1877).
The principle underlying the limitations imposed by the due process clause was once seen as a strict concept of territoriality, based on the states' physical power as independent sovereigns over persons and property within their borders. In Pennoyer v. Neff, the Court said:
The authority of every tribunal is necessarily restricted by the territorial limits of the State in which it is established. Any attempt to exercise authority beyond those limits would be deemed in every other forum, as has been said by this court, an illegitimate assumption of power, and be resisted as mere abuse. D'Arcy v. Ketchum et al., 52 U.S. 165, 11 How., 165, 13 L.Ed. 648.
Pennoyer v. Neff, 95 U.S. at 720. See also McDonald v. Mabee, 243 U.S. 90, 91, 37 S.Ct. 343, 344, 61 L.Ed. 608 (1917) ("The foundation of jurisdiction is physical power... ."). Pennoyer did not completely close the door to extraterritorial exertion of personal jurisdiction by state courts, however. The opinion contained a dictum to the effect that foreign corporations could be required to appoint agents for service of process as a condition of the privilege of doing business in the state. The opening in the door thus left ajar provided a basis for the exercise of jurisdiction over absent persons. While the permissibility of such extraterritorial exercises of power was often discussed in terms of legal fictions such as constructive presence, implied consent, and the like, the justification in retrospect can be found, in most cases, in the relations or ties between the defendant and the forum state, which rendered the exercise of power *1309 just and reasonable. See, e.g., Milliken v. Meyer, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940) (domicile, citizenship); Henry L. Doherty & Co. v. Goodman, 294 U.S. 623, 55 S.Ct. 553, 79 L.Ed. 1097 (1935) (implied consent, doing business); Hess v. Pawloski, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091 (1927) (implied consent, use of automobile).
The Pennoyer system dealt with the problem of the extraterritorial power of state courts by considering the states of the Union as analogous to independent nations. Economic relations among citizens of the several states, however, do not stop at the state boundaries, and the existence of the full faith and credit clause indicates that the framers of the constitution never expected them to do so.
The jurisdictional problem in the United States is distinctive because, while the country is socially and economically essentially a unitary state, legally and politically it is in many respects a federation of distinct polities. It is this conjunction of circumstances that is peculiar. Our citizens have a legal right to move from state to state and cultural homogeneity makes it easy and inviting to do so. It is notorious that we are a mobile population, and we have been such since the beginning, as the lives of Franklin, Lincoln, and Stephen Field himself illustrate. Our citizens also have a legal right to project themselves commercially into all parts of the nation, not only to trade but to invest in business, to draw out profits, to buy property, and to become economically domesticated. The vastness and richness of the land has made wide-ranging economic adventure attractive. And this, too, has been true since the beginning of our history. Without these social and economic conditions, the federation could have remained an aggregation of social islands whose transactions inter sese, and whose conflicts and jurisdictional problems, would have remained the ancient and essentially simple ones of the merchant traders. (This, together with certain fairly standard problems of domestic relations, is what international conflict of laws was mostly about until the last two decades.)
At the same time, the legal and political pluralism of the American federation is also significant. If this were legally a unitary state, the problems of notice and of territorial jurisdiction would descend to those of venue. In fact, however, the states are autonomous in precisely the respects that are relevant to the problems of judicial jurisdiction. The states are chiefly responsible in our federal union for the promulgation and enforcement of legal rules governing private relations and for the maintenance and operation of civil courts. Autonomy in respect to private law requires rules for choice of law, which in turn can be devised at least in part in terms of choice of forum. In any event, the existence of coordinate tribunals of presumptively equal competence requires rules for choice of forum, and there seems nothing artificial in conceiving of them as rules of jurisdiction and in a real sense territorial.
The peculiar features of the jurisdictional problem in the United States, then, is that our national economic and social unity is conducive to the full panoply of substantive transactions found internally in a unitary state but our political plurality requires a choice of law and jurisdictional rules as among separate sovereigns. The combination would be unendurable as a practical matter but for two facts. First, there are powerful historical and cultural forces that conduce to similarity and reciprocity of state law. Second, the Full Faith and Credit Clause and the Due Process Clause embody judicially enforceable limitations on state-court authority. However interpreted from time to time, they make state-court jurisdiction a matter of American municipal law and not a species of demi-international law.
Hazard, A General Theory of State-Court Jurisdiction, 1965 Sup.Ct.Rev. 241, 246-247 (citations omitted). The "unitary" nature of the Union economically and socially gave rise not only to a need for extraterritorial recognition of state court decrees but also *1310 to a need for limitations on the recognized extent of state court power. This points up one feature of the Pennoyer decision that retains its vitality: a state court decision that may rightfully be refused recognition by a sister state is also void in the state where rendered.
In the United States, the jurisdiction of a state court is controlled concurrently by state legislatures acting in accordance with state constitutions and by the United States Supreme Court as final interpreter of the federal constitution and laws. On the one hand, a state court may lack jurisdiction altogether, even if it is fully authorized by the laws of the state in which its sits, because of federal limitations on state adjudicative powers; on the other, in the great majority of cases the judgment of a state court having jurisdiction must be recognized by other states under the full-faith-and-credit clause. This federal control affords an opportunity  unavailable at the international level  for a rational allocation of actions among the several states, designed to minimize the expense and inconvenience to the parties and to secure to each state the ability to adjudicate effectively with respect to matters of its legitimate concern.
Note, Developments in the Law: State-Court Jurisdiction 73 Harv.L.Rev. 909, 912 (1960). The problem of state court jurisdiction has thus come to be seen not in terms of the mutually exclusive territorial power of independent sovereigns, but rather as a question of the "rational allocation" of judicial business based on an analysis that focuses on consideration of fairness to the defendant in light of the forum state's legitimate concerns. Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
The shift in emphasis from the territorial view to a view emphasizing reasonableness in the context of relations among interdependent states as members of a federated union was made explicit in International Shoe Co. v. Washington:
Historically the jurisdiction of courts to render judgment in personam is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. Pennoyer v. Neff, 95 U.S. 714, 733, [24 L.Ed. 565]. But now that the capias ad respondendum has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278.
326 U.S. at 316, 66 S.Ct. at 158. The inquiry into whether there are "minimum contacts" between the forum state and a nonresident business enterprise must look at the nature of the defendant's activities in the state. Continuous and systematic activities provide a reasonable basis for the assertion of jurisdiction. Single, isolated acts are viewed differently.
Whether due process is satisfied must depend ... upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. The clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations.
Id. at 319, 66 S.Ct. at 159.
The United States Supreme Court's most recent pronouncement on the subject of state court jurisdiction in personam came in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In that case the plaintiffs purchased an automobile in New York and were injured in an accident in Oklahoma. *1311 They brought a product liability action in Oklahoma, naming as defendants the car's manufacturer, the importer, a regional distributor and the seller, a retail dealer. The regional distributor and the retail dealer entered special appearances, contesting the Oklahoma court's jurisdiction over them. The trial court held that it had jurisdiction and the Supreme Court of Oklahoma affirmed. On certiorari, the United States Supreme Court reversed. The majority opinion emphasized the protective function of the due process clause:
The concept of minimum contracts ... can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.
Id. at 291-92, 100 S.Ct. at 564.
In support of its conclusion that there was no jurisdiction because the defendants had no contacts, ties, or relations with the State of Oklahoma, the Court majority made the following observation:
Petitioners carry on no activity whatsoever in Oklahoma. They close no sales and perform no services there. They avail themselves of none of the privileges and benefits of Oklahoma law. They solicit no business there either through salespersons or through advertising reasonably calculated to reach the State. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market. In short, respondents seek to base jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma.
444 U.S. at 295, 100 S.Ct. at 566 (emphasis added). Thus the record in Woodson did not establish facts such as those which have been alleged (without being refuted) in this case. The Court, in deciding Woodson, did not deal with the issue in the case at bar: whether a manufacturer who by continuous and systematic activity indirectly through others serves or seeks to serve a state's market is subject to the jurisdiction of that state's courts. The majority's opinion contains dicta, however, suggesting that jurisdiction may properly be asserted in such a case:
When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," Hanson v. Denckla, 357 U.S., at 253 [78 S.Ct., at 1239], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State. Compare Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961).
Id. 444 U.S. at 297-98, 100 S.Ct. at 567. The Court's citation of Gray v. American Radiator & Standard Sanitary Corp., as a distinguishable case is significant in that it indicates how the Court might be expected to rule in a case such as ours here.
In Gray the plaintiff alleged that she had been injured by the explosion of a water *1312 heater caused by the negligent manufacture of a safety valve. From the allegations of the complaint and the statements in the valve manufacturer's affidavit in support of its motion to quash service of process, it appeared that the safety valve was manufactured in Ohio by a company headquartered there; that in the course of its business the manufacturer sold the valve to the water heater manufacturer, which incorporated the valve, in Pennsylvania, into a water heater; that in the ordinary course of commerce the water heater was sold to a consumer in Illinois; and that the valve manufacturer had no agent and conducted no business in Illinois. The Supreme Court of Illinois reversed the trial court's dismissal of the claim against the valve manufacturer, saying:
In the case at bar defendant does not claim that the present use of its product in Illinois is an isolated instance. While the record does not disclose the volume of Titan's business or the territory in which appliances incorporating its valves are marketed, it is a reasonable inference that its commercial transactions, like those of other manufacturers, result in substantial use and consumption in this State. To the extent that its business may be directly affected by transactions occurring here it enjoys benefits from the laws of this State, and it has undoubtedly benefited, to a degree, from the protection which our law has given to the marketing of hot water heaters containing its valves. Where the alleged liability arises, as in this case, from the manufacture of products presumably sold in contemplation of use here, it should not matter that the purchase was made from an independent middleman or that someone other than the defendant shipped the product into this State.
With the increasing specialization of commercial activity and the growing interdependence of business enterprises it is seldom that a manufacturer deals directly with consumers in other States. The fact that the benefit he derives from its laws is an indirect one, however, does not make it any the less essential to the conduct of his business; and it is not unreasonable, where a cause of action arises from alleged defects in his product, to say that the use of such products in the ordinary course of commerce is sufficient contact with this State to justify a requirement that he defend here.
Id., 22 Ill.2d at 441-42, 176 N.E.2d at 766.
A number of courts have cited the Gray case as authority for the proposition that a manufacturer engaged in interstate commerce, which expects its products to be used in other states, can reasonably expect to be held subject to the jurisdiction of those other states' courts. Coulter v. Sears, Roebuck & Co., 426 F.2d 1315 (5th Cir.1970); Mann v. Frank Hrubetz & Co., 361 So.2d 1021 (Ala. 1978); Doggett v. Electronics Corp. of America, 93 Idaho 26, 454 P.2d 63 (1969); Andersen v. National Presto Industries, Inc., 257 Iowa 911, 135 N.W.2d 639 (1965); Ehlers v. U.S. Heating and Cooling Mfg. Corp., 267 Minn. 56, 124 N.W.2d 824 (1963); Metal-Matic, Inc. v. Eighth Judicial Dist. Court, 82 Nev. 263, 415 P.2d 617 (1966); see State ex rel. Deere & Co. v. Pinnell, 454 S.W.2d 889 (Mo. 1970).
If a manufacturer is responding to the opportunities created by the existence of an interstate or nationwide market, then the reasonableness of requiring it to defend an action, arising out of its business activity, in another state, is a question not entirely divorced from the substantive question of the manufacturer's liability for the consequences of defects. The manufacturer is the person in the best position to insure against such consequences, and it is less burdensome to require the manufacturer to defend in the state of the injured consumer's residence than to require the plaintiff to travel to the state of the manufacturer's domicile. In Phillips v. Anchor Hocking Glass Corp., 100 Ariz. 251, 413 P.2d 732 (1966), the only relation of the defendant to the forum state that could be established was the presence of its defective product there. The defendant argued that there had not been shown any conduct constituting a purposeful availment of the privilege of having its products sold in the forum state. The court responded:

*1313 Upon reflection, we think it would be a rare situation where a manufacturer could not foresee the presence of his product anywhere within the continental United States. That possibility should motivate him to seek appropriate insurance. Ehrenzweig, Products Liability in the Conflict of Laws  Toward a Theory of Enterprise Liability Under "Foreseeable and Insurable Laws": II, 69 Yale L.J. 794; Morris, Enterprise Liability and the Actuarial Process  The Insignificance of Foresight, 70 Yale L.J. 554.
We do not think foreseeability itself is a necessary prerequisite to fairness. Cf. Note, Products Liability and the Choice of Law, 78 Harv.L.R. 1452. Ordinarily, a manufacturer is primarily interested in the consumption of his product, not where it is consumed. If his product is defective he may be held liable for the damage caused thereby whether suit is brought in his state or plaintiff's state. The manufacturer should not necessarily be allowed to divorce himself from liability for a defective product solely because he cannot foresee where it will be consumed.
Id. at 259-60, 413 P.2d at 737-38. Other cases have held that the occurrence of a single injury in the state is a sufficient basis upon which to conclude that the nonresident manufacturer's product got there through normal commercial channels, thus justifying the conclusion that sufficient contacts existed. E.g., Continental Oil Co. v. Atwood & Morrill Co., 265 F. Supp. 692 (D.Mont. 1967); Duignan v. A.H. Robins Co., 98 Idaho 134, 559 P.2d 750 (1977).
As Gray v. American Radiator and Standard Sanitary Corp. indicates, the fact that a nonresident manufactures a component part outside the state and takes no part in the sale, distribution, or marketing of the finished product in the state is no basis for a limitation on jurisdiction. See, e.g., Deveny v. Rheem Mfg. Co., 319 F.2d 124 (2d Cir.1963); Doggett v. Electronics Corp. of America; Fisher v. Albany Machine & Supply Co., 261 La. 747, 260 So.2d 691 (1972); State ex rel. Deere & Co. v. Pinnell; Metal-Matic, Inc. v. Eighth Judicial Dist. Court; Hodge v. Sands Mfg. Co., 151 W. Va. 133, 150 S.E.2d 793 (1966); Hasley v. Black, Sivales & Bryson, Inc., 70 Wis.2d 562, 235 N.W.2d 446 (1975). The Atwood company benefits from the protection Florida law provides Ford Motor Company in the marketing of its automobiles in Florida.
We conclude that the Atwood Vacuum Machine Company's lack of direct presence and activity within the borders of Florida is no bar to our holding that the minimum contacts test of International Shoe is met. Furthermore, even though the injured Florida plaintiffs are out of the lawsuit, the remaining dispute being between Ford and Atwood, we hold that Florida as the place of injury has a sufficient interest in the litigation to assert jurisdiction over the nonresident part manufacturer.
The circuit court erred in holding section 48.193(1)(f)2 unconstitutional under the facts of this case. The order of dismissal is reversed and the case is remanded with directions that the complaint be reinstated.
It is so ordered.
ADKINS, OVERTON and ALDERMAN, JJ., concur.
SUNDBERG, C.J., dissents with an opinion with which ENGLAND, J., concurs.
SUNDBERG, Chief Justice, dissenting.
I do not believe that utilization of Florida's "long arm" statute, section 48.193(1)(f)(2), Florida Statutes (1977), to assert jurisdiction over the Atwood company, a foreign car components manufacturer, meets with due process requirements as delineated in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). The necessary predicate for exercise of this state's jurisdiction is lacking because Atwood carries on no discernable activity in this state. Atwood closes no sales and performs no services in Florida. Its only connections with this state are that it is foreseeable that some of Atwood's components *1314 might end up in cars sold by Ford in Florida, and the indirect economic benefit derived from such sales.
The United States Supreme Court has repudiated foreseeability as a sufficient contact to satisfy due process requirements for the jurisdictional predicate: "`[F]oreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." World-Wide Volkswagen, 444 U.S. at 295, 100 S.Ct. at 566. Atwood has simply failed to "purposefully [avail] itself of the privilege of conducting activities within the forum State." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). See also Harlo Products Corp. v. J.I. Case Co., 360 So.2d 1328 (Fla. 1st DCA 1978). To accept that foreseeability of product use in this state is the sole requirement for establishing a sufficient jurisdictional nexus between a component manufacturer and this state, is to accept the following:
[A] local California tire retailer could be forced to defend in Pennsylvania when a blowout occurs there; a Wisconsin seller of a defective automobile jack could be haled before a distant court for damage caused in New Jersey; or a Florida soft drink concessionaire could be summoned to Alaska to account for injuries happening there. Every seller of chattels would in effect appoint the chattels his agent for service of process. His amenability to suit would travel with the chattel.
World-Wide Volkswagen, 444 U.S. at 296, 100 S.Ct. at 567 (citations omitted). Likewise, the supplier of raw materials would be subject to litigation anywhere in the states. The United States Supreme Court could not accept this, nor can I.[*]
The only manner in which foreseeability is relevant is in terms of a party's reasonable expectation that he may be subject to a state's jurisdiction:
[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.
Id. at 297, 100 S.Ct. at 567. I cannot fathom how this Court can reasonably expect Atwood to anticipate litigation in every jurisdiction throughout this country.
The second part of the asserted connection with this state, the indirect economic benefits derived by Atwood from Ford car sales in Florida, has also been rejected by the Supreme Court:
[F]inancial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that State. In our view, whatever marginal revenues petitioners may receive by virtue of the fact that their products are capable of use in Oklahoma is far too attenuated a contact to justify that State's exercise of in personam jurisdiction over them.
Id. at 299, 100 S.Ct. at 568 (citation omitted). Indirect economic benefit, therefore, is too tenuous a connection to establish sufficient contact between a foreign components manufacturer and Florida, since Atwood is only economically present in this state due to Ford's marketing of the finished product.
Extraterritorial assertion of jurisdiction cannot here be justified on public policy grounds of providing to Florida resident consumers a remedy against foreign component manufacturers. Florida consumers will invariably be able to reach a pecunious manufacturer-distributor of the finished product because of significant business contacts that a manufacturer-distributor necessarily incurs through his commercial efforts.
Ford would also have this Court cast it in the role of the original consumer plaintiff. *1315 But Ford is not a Florida consumer. It seeks indemnity against Atwood based mainly on claims of breach of warranty that occurred in other states. This indemnity action will concern design, manufacture, sale, transportation, control, custody, and installation of the product, all of which took place in either Illinois or Michigan. The relationship between Atwood and Ford, the heart of the instant controversy, is centered in Illinois and Michigan, and it is much more rational for a Florida court to allocate this litigation to those states. This would be fairer to Atwood and no less so to Ford, whose only relationship with Atwood is in those states.
Today's decision does not really increase protection for the Florida consumer. Rather, it allocates the burden of litigating in a foreign forum against components manufacturers, and gives unfair advantage to a national manufacturing and distributing company such as Ford, which is well established in all states and which can litigate with equal facility in any state. Shaffer v. Heitner teaches us that we must look at the foreign defendant's contacts with out state to determine whether the contacts meet due process standards for asserting jurisdiction, and not at the resident plaintiff's contacts. Because the defendant Atwood carries on no activity in this state and its presence is not materially manifest, the majority has failed to heed the lesson of Shaffer v. Heitner.
I would affirm the order of the trial court.
ENGLAND, J., concurs.
NOTES
[*] Foreseeability as a test for constitutional minimum contacts becomes all the more meaningless when one recognizes that the majority admits most manufacturers of components are always presumed to foresee the use of their products throughout the country. See Phillips v. Anchor Hocking Glass Corp., 100 Ariz. 251, 413 P.2d 732 (1966) (cited by the majority).